**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

STACEY WEBB


                    Plaintiff,                          Case No.  05-74868

                                                        HONORABLE ROBERT H. CLELAND
                                                        HONORABLE STEVEN D. PEPE
vs.

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY

                    Defendant
_____/

## REPORT AND RECOMMENDATION

### I.     BACKGROUND

       Stacey Webb brought this action under 42 U.S.C. § 405(g) and §1383(c)(3)  to challenge

a final decision of the Commissioner denying her application for Supplemental Social Security

Income (SSI) under Title XVI of the Social Security Act.  Both parties have filed motions for

summary judgment, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For

the following reasons, IT IS RECOMMENDED that Plaintiff's motion for summary judgment be

DENIED and the Commissioner's motion for summary judgement GRANTED.

### A.     Procedural History

       Plaintiff applied for SSI on September 13, 2001, alleging that she became disabled

September 1, 2000, as a result of obesity, Arnold Chiari malformation, headaches, diabetes

mellitus, hypertension, and asthmatic bronchitis (R. 45-47 and R 62).  After Plaintiff's claim was

initially denied (R. 32-35), a hearing was held on December 17, 2003, before Administrative

1

Law Judge Douglas Jones (ALJ) (R. 18-25).[1]  Plaintiff was represented by her current attorney. Vocational Expert Stephanie Leech (VE) also testified (R. 247-286).

In a January 22, 2004, decision ALJ Jones concluded that Plaintiff was not under a disability as defined by the Act because she remained capable of performing a significant number of sedentary jobs in the economy (R. 18-25).  The Appeals Council denied Plaintiff's request for review (R. 5).

## B.    Background Facts

### 1.    *Hearing Testimony*

Plaintiff was born October 29, 1958 (R. 251).  She earned a high school diploma in 1976 and an associates degree in business from Baker College in 1985 (R. 252).  Plaintiff has lives in a mobile home with her husband, son, age 20, and mother, age 69 (R. 250-251). Since 2000 Plaintiff has been supported by her husband's social security disability payments.

Plaintiff has a driver's license and drives three to four times per week, usually to the corner store and to pick up her son from school at the University of Michigan-Flint (R. 257). Although she has been to Port Huron and Canada a few times on day trips,  she has not been on any extended vacations away from Flint in the last two years.   Reading is her only hobby.  She

---

[1] Plaintiff incorrectly asserts that the "Social Security Field Office recommended an award of benefits" after she was interviewed on September 14, 2001 (Dkt. #11, pg. 7, 14). This assertion is plainly wrong. The field office interview took place prior to any medical development of Plaintiff's claim and just one day after Plaintiff signed her benefits application on September 13, 2001 (R. 48).  The notation on the field office form merely indicated that Plaintiff was first eligible for benefits on August 1, 2001, based on her SSI application date (R. 55). The purpose of the interview was not to make a disability determination, but simply to gather information and enter her application into the record. The state agency ultimately found Plaintiff *not disabled* during the initial phase of administrative review (R. 31, 32-35, 114-21).

has not been to the movies in years because she cannot fit into the seats (R. 269).  She does go to restaurants, but is unable to fit into booths.

Plaintiff alleges disability as of September 1, 2000.   Her last job was briefly working as a health care provider in 2000 for which she received earnings of $1,800.00 from the Department of Community Home Health (R. 252).  She worked five hours a day and helped with household chores and grocery shopping (R. 252-253).  Due to health issues, Plaintiff quit this job.

 In 1998, she was hired by Steams It through a temporary service, Outsource International.  Steams It eventually gave her a permanent position handling scheduling (R. 255).  Because of headaches Plaintiff called in sick frequently and was ultimately fired.  She subsequently began to see a neurologist.

In 1994, Plaintiff worked briefly at K-Mart as a cashier for a few hours a day.  She quit because of severe pain in her back and legs from standing.  "This was from the leg, I'm assuming its from the back, the weight pulling on my back" (R. 255).  Plaintiff also worked for David Steiner Farm Equipment in 1992 as a receptionist and for Massatech Automotive Systems in 1992, operating a sewing machine (R. 256).

Plaintiff stated her headaches first became a problem about three months before she stopped working as she started experiencing "twitching" in her face." (R. 260).  The headaches are constant, but vary in degree.  Bright lights, such as headlights and computer screens, quick head movements and lack of neck support in bed intensify her headaches (R. 261).  She rated the pain on a "normal day"  at a three on a scale of one to ten. The pain "starts at the base of the skull," and then "cuts forward up into the lobes in my head." She is able to function, but often cries and has to take medication two to three times a week (R. 260 - 261).  In addition, she

3

occasionally has to "get in darkness to relieve them" and takes Darvocet. She typically takes two to four Darvocet for relief (R. 263). Plaintiff has not tried anything other than Darvocet for her headaches.

Typically, Plaintiff sleeps only four and a half hours a night due to breathing problems, choking, headaches and trying to get comfortable (R. 261-262). Yet, her headaches do not improve with increased sleep.

Plaintiff saw neurologist, Dr. B.B. Ganatra, M.D., for treatment of her headaches. Dr. Ganatra suggested surgery on Plaintiff's "tonsils," which are applying pressure to her spinal area, thereby possibly causing the headaches. Plaintiff indicated this is a side effect of the Arnold-Chiari malformation. Yet, Plaintiff stated Dr. Ganatra currently wants Plaintiff to forgo surgery because of possible complications from other health problems such as diabetes, breathing trouble and weight.

Plaintiff's weight problem limits her ability to work because of pain in her lower back and right upper thigh (R. 265). Plaintiff stated her last recorded weight 18 months ago was 402 pounds (R. 264). Since that time Plaintiff indicated she has lost approximately 35 to 40 pounds because of colitis. ALJ Jones noted that medical records from one month prior to the hearing indicated she weighed 313 pounds on one occasion and 302 pounds on another (R. 272).

Plaintiff stated her weight affects her ability to walk, stand and sit (R. 264 - 265). She can "walk a block before I'd start hurting and maybe a block and a half before I just had to sit down" (R. 265). She can only stand in one spot for about ten minutes. In an eight hour day, she could stand for about two hours if allowed to sit "back and forth" (R. 265). Her doctor has not recommended any type of exercise because of her back. She tried going to a Universal Health

Spa  but her symptoms worsened with exercise (R. 265-266).

Plaintiff's vision problems also effect her ability to work.  She described a "moon shaped object in my vision" occurs three to four times a month (R. 266).  In addition, Plaintiff was diagnosed with diabetes two years ago and is currently taking medication.[2]  Her opthamologist relates her vision problems to the diabetes.  Additionally, she has constant thirst from diabetes and bouts with diarrhea from medication (R. 266 - 267).  She stated she gets light headed when she moves her head too fast.  This started about the same time as the diabetes and occurs approximately three times a month.  She also has had tingling in her fingers for about eight to nine months.  She naps a lot during the day (R. 267).  After having two months of diarrhea and nausea and vomiting she underwent a colonoscopy on September 22 and was diagnosed with ulcerative colitis.

Plaintiff described a typical day as being mostly at home, reading, watching TV and talking to friends on the phone (R. 268).  Her husband and son help with cooking and laundry because she cannot stand very long (R. 269).  She grocery shops with her husband and uses an electronic shopping cart ("Amigo").  She has used the Amigo for about one year.  She indicated she can carry one bag of groceries and a gallon of milk, but is unable to make several trips because of  "shortness of breath" (R. 270).  She is able to handle small objects and has no problems with writing, grasping, reaching, pushing or pulling.  Plaintiff also notes in her Daily Activity Sheet that she loads the dishwasher, cleans the kitchen and dusts furniture (R. 80-82).

---

[2] Plaintiff stated later in her testimony that she is uncertain as to when she was diagnosed with diabetes.   While Plaintiff does not drink,  she noted that "part of this problem with the (inaudible) area is memory, [it] causes you to have some short term memory loss.  I tend to get dates confused "(R. 271).

She takes Glucophage and Glyburide for her symptoms, but complains of their side effects, including diarrhea and nausea.

Plaintiff could not think of any sedentary jobs she might be able to handle. She expressed concern that bright lights from computers could intensify her headaches (R. 270-271). She does not know if she could work sedentary jobs that did not require a computer, such as selling tickets in movie theaters, parking lot attendant or answering phones (R. 271).

### 2.     *Medical Evidence*

A number of magnetic resonance imaging ("MRI") studies have been completed. A November 15, 1998, MRI and March 30, 1999, MRI were interpreted as negative (R. 191-192). Yet, an August 2, 2002, MRI showed that a Grade I Chiari malformation (R. 187).

On October 5, 1999, Steven Hysell, M.D., saw Plaintiff in the Neurosurgery Clinic at Henry Ford Hospital (R. 160-161). Cranial nerve examination revealed good extraocular eye movements and good visual acuity. Although sensation to pinprick and light touch was diminished slightly on the left side of Plaintiff's face, Plaintiff had normal facial movements. Dr. Hysell recommend surgical decompression of her cerebellar tonsils.

In February 2002, Richard Kovan, M.D., examined Plaintiff at the request of the state disability determination service (R. 108-109). Plaintiff's range of motion was within normal limits, but she could only half squat and come to a standing position secondary to her "large body habitus." Dr. Kovan found no evidence of neurological impairment, but opined that Plaintiff suffered from some morbid obesity.

Dr. Soon Choi, M.D., Plaintiff's primary treating physician for several years, treated her for non-insulin dependent diabetes mellitus, controlled hypertension, a history of asthmatic

6

bronchitis, an episode of ulcerative colitis, headaches and obesity (R. 90-107, 128-151, 204-205).  In March 2002, Dr. Choi reported that Plaintiff's hypertension and diabetes mellitus were under good control (R. 140).  In the lumbar spine, there was no significant degenerative changes and no acute osseous findings (R. 144).

In August 2002, consultant neurologist B.B. Ganatra M.D., saw Plaintiff for a neurological follow-up regarding Arnold Chiari malformation and visual disturbance (R. 152-154).  Her eye examination was normal and blood sugars were under control.  The Arnold Chiari malformation was mild and involved a downward displacement of cerebellar tonsils.  Dr. Ganatra stated that physicians at Henry Ford Hospital recommended decompressive surgery to correct the effects of the Arnold Chiari malformation, but Plaintiff declined to have it done.[3] Sleep studies were done at McLaren Hospital, which Plaintiff indicated to Dr. Ganatra showed no evidence of sleep apnea.  Dr. Ganatra concluded that Plaintiff's history was suggestive of migraines.

On November 2, 2003, Dr. Srimvasan completed a residential functional capacity statement in which he stated Plaintiff could sit for eight hours and stand for one hour during an eight hour work day (R. 198-199).  In addition, he indicated Plaintiff could lift 10 pounds rarely and 5 pound occasionally.  He found Plaintiff was extremely limited in reaching, pushing and pulling and fine manipulation.  He also noted Plaintiff's inability to perform in front of computers and bright lights.

---

[3] Plaintiff indicated that originally there was a reluctance by her physicians to recommend surgery due to complications her weight may cause.  Yet, Dr. Ganatra states that physicians at Henry Ford Hospital told Plaintiff they could do the surgery in a sitting position, thereby decreasing the problems associated with Plaintiff's weight, but she chose to not have it done.

On November 7, 2003, Dr. Srimvasan completed a medical assessment in which he described Plaintiff's mental ability to do work related activities (R. 201-203).  He found Plaintiff moderately limited in her ability to perform one to two step low-stress unskilled jobs on a regular basis, to travel to unfamiliar places, to maintain attention and concentration for extended periods and to complete a normal workweek without interruption.

On December 4, 2003, Dr. Choi completed a residential functional capacity statement in which he stated Plaintiff cannot sit for more than two hours or be on her feet more than one hour during an eight hour work day (R. 204-205).  In addition, he indicated that Plaintiff could not lift or carry more than 5 pounds and can only occasionally engage in simple grasping, reaching and pushing and pulling.  He concluded that because of Plaintiff's morbid obesity her activity range was very limited.

On December 4, 2003, Dr. Choi also completed a medical assessment in which he described Plaintiff's mental ability to do work related activities (R. 207-209).  He found Plaintiff moderately limited in her ability to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, to remember locations and work-like procedures, to remember very short and simple instructions, and to perform one to two step low-stress unskilled jobs on a regular basis.

### 3.    *Vocational Evidence*

ALJ Jones posed the following hypothetical to VE Stephanie Leech: an individual of Plaintiff's age, education and past work experience who is limited to performing sedentary work involving only occasional bending at the waist or knees, occasional kneeling, but no crawling, climbing stairs or ladders, no exposure to unprotected heights or uncovered moving machinery,

8

and no fine visual acuity. Fine visual acuity meaning small objects an eighth of an inch or less in diameter. In addition, the job should not involve exposure to very bright lighting or strobe lighting, no use of a computer screen or similar device, and no rapid head movements (R. 274). VE Leech stated such a person would not be able to perform Plaintiff's past jobs as she performed them or as they generally exist in the national economy. She indicated that the primary limiting vocational factors were Plaintiff's inability to use a computer as well as the common use of bright lights in offices.

ALJ Jones then clarified his description of bright lights and visual acuity indicating bright lights meant very bright lights and not usual office lighting. Additionally, visual acuity allowed for being able to read print (R. 275). VE Leech indicated Plaintiff's skills would still not be transferrable to a semiskilled job within the limitations described (R. 276). Yet, she stated that such a person could perform unskilled work such as 3,500 assembly jobs , 2,000 packer jobs, 1,500 sorter jobs, and 1,800 parking lot attendant jobs. When later asked "what if a person could not tolerate ordinary office lighting," she  noted that she had already selected jobs that would have less bright lights than the typical office (R. 277).   She stipulated that the additional restriction of needing to sit or stand at will would reduce the positions availability to 2,800 assembly jobs , 1,700  packer positions and 1,200 sorter jobs. The available parking attendant jobs did not change.

In response to questions from Plaintiff's counsel, VE Leech testified that lifting limitations of 10 pounds would reduce the availability of proposed jobs to 3,000 assembly jobs, 1,800  packer positions, and 1,200 sorter jobs.. Again there would be no affect on parking lot attendant jobs. If restrictions of lifting 10 pounds occasionally and the sit stand option were

combined it would reduce the available positions to 2,200 in assembly, 1,300 packer jobs, 1,000 sorter positions and have no affect on the 1,800 parking lot attendant jobs (R. 278). In addition, difficulty reading would not affect the number of available jobs.

Counsel then posed a hypothetical of an individual with a 10 pound weight restriction, sit stand option and need to possibly take off three hours once a month to go into a dark room. VE Leech opined she did not believe that would preclude all employment (R. 279-280). Moreover, employment would not be precluded if a person were able to lift only 5 pounds occasionally with a sit stand option. Yet, if a person had to go into a room and lay down for three hours at a frequency of two to three times per week, this would preclude all employment.

VE Leech testified that the positions of assembly, packer and sorter would require constant upper extremity use involving up to 10 pounds of force occasionally. In addition, within the context of a sedentary job with a sit stand option, 10 pound weight restriction, and bright light restriction, a person could be doing some pushing and pulling and fine and gross manipulation. A parking lot attendant could be picking up coins and dollars and a sorter would be seeing things as they go past and maybe striking some of them (R. 281). There might also be a need for some walking and carrying of parts in the jobs she listed, but "it wouldn't be a large element of the job" (R. 282).

On re-examination by ALJ Jones, the VE stated she should not have reduced the number of jobs available for a person with an occasional 10 pound weight restriction, and in fact, there was no change. If the weight restriction were reduced to 5 pounds occasional, there would be a change to 1,800 assembly jobs, 1,200 packer jobs, 900 sorter jobs and no affect on parking lot attendant positions (R. 282-283).

An exchange ensued between counsel and ALJ Jones following counsel's attempt to incorporate the term "moderately limited" into a hypothetical posed to the VE (R. 283). ALJ Jones requested the term be expressed in "terms of some quantifiable event." Counsel responded that "moderate limitation" is a term used by the Social Security Administration and not quantified by them. The ALJ noted the Social Security Administration does not use the term as a vocational question but rather "as a means of expressing a medical concept which then needs to be translated into some vocational terms" (R. 283-284). Therefore he did not allow counsel to ask his question as posed, but invited him to ask it within the parameters he laid out. Counsel declined.

### 4.    *ALJ Jones' Decision*

ALJ Jones found that Plaintiff was not under a disability as defined in the Social Security Act at any time through the date of his decision (R. 24). He opined that Plaintiff had not engaged in substantial gainful activity since the the alleged onset date of September 1, 2000. ALJ Jones found Plaintiff has a combination of impairments that are severe within the meaning of 20 CFR § 404.1520 (R. 23). Yet, Plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of any impairment listed in Appendix 1, Subpart P, Part 404 (the "Listing").

ALJ Jones found that Plaintiff's limitations preclude her from performing her past relevant work and that she does not have any transferable skills that can be used for work within her residual functional capacity (R. 24). He found that no period of 12 consecutive months have passed during which Plaintiff lacked the residual functional capacity for sedentary work with limitations of only occasional bending at the waist or knees, occasional kneeling, no crawling, no

11

climbing stairs, no exposure to very bright lights, no prolonged use of computer screens, no fine

visual acuity, and no rapid or constant rotation.  He concluded Plaintiff could perform the

sedentary jobs identified by VE Leech, including such work as an assembler, packer, sorter and

parking lot attendant.

ALJ Jones found Plaintiff's allegations of pain and dysfunction were not fully

corroborated by the objective medical evidence and were not consistent with Plaintiff's ordinary

activities, which are generally consistent with the exertional demands of sedentary work (R. 21).

While Plaintiff claimed to be unable to use a computer screen without suffering from headaches,

she reported watching television for extended periods of time.  In addition, she cares for her own

personal needs, cooks, does light housework, uses the dishwasher, folds laundry, cares for ill

relatives and drives regularly on local errands.  Although Plaintiff complained of short-term

memory loss, no physician has diagnosed, or proposed treatment or evaluation for a mental

condition that might account for such a symptom (R. 20).  Plaintiff  has on occasion also failed

to check her fasting morning sugars with the required frequency and to comply fully with her

medication regimen.

ALJ Jones noted further that Plaintiff's medical history is not sufficiently severe to

warrant a finding of disability.  In February 2002, Dr. Kovan opined that Plaintiff suffered from

some morbid obesity, but he found no evidence of neurological impairment and indicated her

range of motion was in normal limits.  In March 2002, Dr. Choi reported that Plaintiff's

hypertension and diabetes mellitus were under control.  No evidence of significant stenosis in the

distal common carotoid or proximal internal carotid arteries was noted.  In August 2002,

neurologist Dr. Ganatra examined Plaintiff's Arnold-Chiari malformation and visual

12

disturbances and found her eye examination was normal, her blood sugars were under control and the Arnold-Chiari malformation was mild.  Moreover, through all examinations of the Arnold-Chiari malformation, the tonsillary herniation associated with the Chiari malformation was said to be of a benign nature (R. 19).

Finally, ALJ Jones specifically questioned the credibility of Dr. Choi's December 4, 2003, opinion that Plaintiff cannot sit for more than two hours or be on her feet more than one hour during an eight hour work day (R. 22).  He found it unsupported by specific clinical findings, medical tests results or a coherent medical rationale, and believed it rested primarily on Plaintiff's subjective complaints of back and hip pain and headaches.  Moreover, Dr. Choi's findings contradicted the opinions of several other evaluating and treating physicians, including Dr. Srimvasan's November 2, 2003, opinion that Plaintiff could sit for eight hours.

## II.   ANALYSIS

## A.   Standards Of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Sherrill v. Secretary of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are

13

not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry their burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than their past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[4] A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists that the Plaintiff can perform.

## B.    **Factual Analysis**

Plaintiff raises two challenges to the Commissioner's decision: (1) ALJ Jones did not present the VE with an accurate hypothetical question because he failed to sufficiently account for the impact of Plaintiff's headaches on her ability to perform work-related activities and (2) ALJ Jones erred in forming an accurate residual functional capacity of Plaintiff's ability by failing to properly consider the opinions of Plaintiff's treating physicians.

### *1.    Hypothetical Question*

Plaintiff's counsel argues that substantial evidence does not support the ALJ's

---

[4] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

determination because ALJ Jones failed to adequately account for Plaintiff's headaches in h is

hypothetical question (Dkt. #11).  Specifically, Plaintiff claims that the ALJ attempted to account

for Plaintiff's headaches by providing the VE with a hypothetical, which included the following

restrictions: avoid tiny print, bright lights and prolonged use of computer screens.  Yet, Plaintiff

contends these limitations were insufficient to properly eliminate the disabling aspects of

Plaintiff's headaches.

ALJ Jones has adequately addressed and accommodated Plaintiff's headaches.  In ALJ

Jones' second hypothetical to the VE, he asked her to consider a person who could not use a

computer screen for any length of time and added that the worker would have difficulty

tolerating even ordinary office lighting.  VE Leech  noted the earlier response had already

selected jobs in work settings with less bright lights than the typical office.  Thus, the VE

testimony upon which ALJ Jones relied accommodated a person who may get headaches because

of increased sensitivity to ordinary office lighting (R. 277). Plaintiff has pointed to no evidence

that Plaintiff cannot tolerate lighting of an intensity lower than in an ordinary office.  VE Leech

indicated that such a person could still perform unskilled work, such as 3,500  assembly jobs ,

2,000  packer 2,000 jobs, 1,500  sorter jobs , and 1,800 parking lot attendant jobs.  She noted that

the additional restriction of needing to sit or stand at will would reduce the positions availability

to 2,800 assembly jobs, 1,700  packer positions, and 1,200 sorter jobs.  The available parking

attendant jobs did not change.  Again, VE Leech indicated the listed jobs would not involve

bright lights and involved lower light than found in an ordinary office setting.  Moreover, she

stated that a further restriction requiring print of an eighth of an inch or greater would have no

effect on her answer.

In addition, ALJ Jones indicated his belief that Plaintiff's claims of headaches were not fully corroborated by the objective medical evidence and not consistent with Plaintiff's ordinary activities.  The ALJ may pose hypothetical questions to the VE which include only those limitations which the ALJ finds credible.  *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993).  He credited some problem Plaintiff had with light sensitivity causing headaches which was accommodated in his questions to the VE, but he is not bound by her more extreme claims.. ALJ Jones noted that while Plaintiff claimed to be unable to use a computer screen without suffering from headaches, she reported watching television for extended periods of time. Further, she cares for her own personal needs, cooks, does light housework, uses the dishwasher, folds laundry, cares for ill relatives and drives regularly on local errands.   Finally, ALJ Jones indicated that Plaintiff's eye examination was normal, her blood sugars were under control and her Arnold-Chiari malformation was mild.  Therefore, ALJ Jones's hypothetical question is legally sufficient as it pertains to headaches.

### 2.    *Proper Use of Treating Physicians' Opinions*

It is well established that the findings and opinions of treating physicians are entitled to substantial weight.  The case law in this circuit has stated that if adequately supported by objective findings, and if uncontradicted by other substantial medical evidence of record, a treating physician's opinion of disability is binding on the Social Security Administration as a matter of law.[5]  The administrative decision could reject a properly supported treating physician's

---

[5]*See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie v. Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980).

16

opinion of disability if the record contains "substantial evidence to the contrary." *Hardaway v. Sec'y of HHS*, 823 F.2d 922, 927 (6th Cir. 1987).

Under the Social Security Administration regulations for SSI, the Commissioner will generally give more weight to the opinions of treating sources, but it sets preconditions for doing so.  20 C.F.R. 416.927.  The regulation  limits the scope of the subject matters on which the Commissioner will give a treating source opinion greater weight to "the issue[s] of the nature and severity of your impairment[s]."  20 C.F.R. § 916.927(d)(2).  Under 20 C.F.R. § 916.927(e), the Commissioner will not defer or provide special significance to treating source opinions on certain subjects that are "reserved to the Secretary" which includes treating physician opinions on a claimant's disability under the Listing, on residual functional capacity or a general and conclusory statement of disability or inability to work. The Commissioner will only be bound by a treating source opinion when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record."  20 C.F.R. 916.927(d).  *See also*, S.S.R. 96-2p.

In the present case, the portions of Plaintiff's treating physicians' opinions to which the ALJ was required to defer, or at least treat with special significance, were their diagnosis of headaches, morbid obesity, diabetes, ulcerative colitis, degenerative joint disease and back pain. Indeed, ALJ Jones adopted these impairments in determining Plaintiff's RFC and thereby reasonably accounted for Plaintiff's limitations (R. 22-23).  Plaintiff argues that the ALJ was also required to give deferential weight to Dr. Choi's and Dr. Srimvasan's observations that she be allowed to "lie down or recline" at her discretion.

Under 20 C.F.R. § 416.913 (b)(6) a treating source "statement about what [a claimant]

17

can still do despite . . . impairment(s)" fall within the Commissioner's definition of "medical

opinion." under §416.927(a)(2) because "what [ a claimant] can still do despite impairment(s)"

and "physical or mental restrictions" are medical judgments about the nature and severity of [a

claimant's] impairment(s)."  The same logic seems to apply for the inverse, i.e. for what a

claimant cannot do in light of the impairment.  Yet, § 416.913 (b)(6) states that in order to be

considered a medical opinion, these residual capacities and limitations must be "based on the

acceptable medical source findings on the factors under paragraphs (b)(1)-(5) of this section."

These factors  are medical history, clinical findings, laboratory findings, diagnosis and treatment.

  Obviously, the Commissioner can give differing weights to the various factors upon which the

treating source's opinion is based with objective verification by tests or examination given more

weight than opinions based on a clinical history taken from the patient.

     As discussed above, in assessing Plaintiff's functional capacity, the ALJ expressly found

her subjective allegations of incapacitating symptoms and limitations not fully credible.

Moreover, ALJ Jones specifically questioned the credibility of  Dr. Choi's December 4, 2003,

opinion that Plaintiff cannot sit for more than two hours or be on her feet more than one hour

during an eight hour work day (R. 22).  He found it unsupported by specific clinical findings,

medical tests results or a coherent medical rationale, and believed it rested primarily on

Plaintiff's subjective complaints of back and hip pain and headaches.  Further, Dr. Choi's

findings contradicted the opinions of several other evaluating and treating physicians, including

Dr. Srimvasan's November 2, 2003, opinion that Plaintiff could sit for eight hours.[6]   Dr.

_____

[6] Moreover, Dr. Srimvasan's indication that Plaintiff could sit for 8 hours would also
seem inconsistent with his finding that Plaintiff must be allowed to lie down or recline at her
discretion.

18

Srimvasan's opinion on Plaintiff's need to lie down is also apparently based on Plaintiff's subjective claims and not on any clinical observations or other medical measures.  An ALJ can discount a medical opinion based solely on a patient's subjective reports.[7]  Therefore ALJ Jones was not bound by these statements of Dr. Choi and  Dr. Srimvasan, and was within the proper scope of his discretion in making credibility findings in determining residual functional capacity and in formulation  of a hypothetical question. His decision is supported by substantial evidence in the record and should be upheld.[8]

## III.   RECOMMENDATION

For the reasons stated above, IT IS RECOMMENDED that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.  Either

---

[7] **Johnson v. Apfel,** 189 F.3d 561, 564 (7th Cir. 1999) (upholding ALJ's opinion which rejected a treating physician's exertional limitation finding because it was based solely on the claimant's statement to the doctor). **Woolf v. Shalala,** 3 F.3d 1210 (8th Cir. 1993) (treating opinion rejected when based solely on the claimant's complaints of pain and unsupported by his or her findings).

[8] Plaintiff also argues that ALJ Jones obstructed Plaintiff's counsel in his efforts to cross examine the VE to determine what work could be performed by Plaintiff within the parameters laid out by her treating physicians.  Specifically, counsel sought to incorporate the term "moderately limited" into a hypothetical posed to the VE (R. 283).  ALJ Jones requested the term be expressed in "terms of some quantifiable event."  Counsel responded that "moderate limitation" is a term used by the Social Security Administration and not quantified by them.  The ALJ noted the Social Security Administration does not use the term as a vocational question but rather "as a means of expressing a medical concept which then needs to be translated into some vocational terms" (R. 283-284).  Therefore he did not allow counsel to ask his question as posed, but invited him to ask it within the parameters he laid out.  Counsel declined.  It cannot be said that the  ALJ's ruling on the form of questioning warrants a reversal where Plaintiff's counsel declined the invitation to ask the question in a different. Nor is it likely that  the use of "moderate limitation" in the cross-examination  would have altered ALJ Jones' decision in this case.

party to this action may object to and seek review of this Report and Recommendation, but must

act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and

E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further

right of appeal.  *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn*, 474 U.S.

140 (1985), *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991).  Filing objections which

raise some issues but fail to raise others with specificity will not preserve all objections that

party might have to this Report and Recommendation.  *Smith v. Detroit Fed'n of Teachers Local

231,* 829 F.2d 1370, 1373 (6th Cir. 1987), *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th

Cir. 1991).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon

this Magistrate Judge.

    ***Note:*** any objections must be labeled as "Objection #1," "Objection #2," etc.; any

objection must recite *precisely* the provision of this Report and Recommendation to which it

pertains.  Not later than ten days after service an objection, the opposing party must file a

concise response proportionate to the objections in length and complexity.  The response must

specifically address each issue raised in the objections, in the same order and labeled as

"Response to Objection #1," "Response to Objection #2," etc.


Date: December 29, 2006                 s/Steven D. Pepe
Flint , Michigan                         United States Magistrate Judge

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 29, 2006, I electronically filed the foregoing paper with the Clerk of Court using the ECF system which will send electronic notification to the following:

Robert J. MacDonald, Attorney at Law
James A. Brunson, AUSA


and I hereby certify that I have mailed via the United States Postal Service the paper to the following  non-ECF participants: <u>not applicable</u>

<u>s/Durene Worth</u>

Deputy Clerk

U.S. District Court

600 Church St.

Flint, MI 48502

810-341-7850
